IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| THE BRANSON LABEL, INC., | ) |
| Plaintiff; | ) |
| vs. | ) Cause No. 6:14-03220-CV-S-GAF |
| THE CITY OF BRANSON, MISSOURI, et al., | ) |
| Defendants. | ) |

**EMPIRE DISTRICT ELECTRIC COMPANY'S
REPLY SUGGESTIONS IN SUPPORT OF ITS
MOTION TO DISMISS UNDER RULE 12(b)(1) AND 28 U.S.C. § 1359
FOR LACK OF SUBJECT MATTER JURISDICTION**

This Court has a number of grounds for dismissal to consider, but the threshold question of jurisdiction remains foremost among them. Empire agrees with its codefendants that other grounds for dismissal are compelling—yet the court need not even reach them, because the lack of jurisdiction is dispositive. The opposition to Empire's motion to dismiss only confirms that the jurisdictional threshold is, for Branson Label, an insurmountable one. Demonstrating proper jurisdiction is the plaintiff's burden, a burden it has utterly failed to meet.

In its response brief (Doc. 29), Branson Label purports to show legitimate business reasons for its actions through three sets of facts: the *acquisition* of Branson Label, the *merger* of Branson Label, and the *business activities* of Branson Label.[1] Far from providing any legitimacy, each one of these presents—at best—a " false or weak reason or motive advanced to hide the actual or strong reason or motive," the very definition of pretext. BLACK'S LAW DICTIONARY 1307 (9th ed. 2009). These pretexts for improperly fabricating diversity jurisdiction are discussed in turn below.

---

[1] Branson Label also includes a set of allegations concerning Branson Label's claimed ownership of certain real estate at issue in its substantive claims. These claims and allegations are specious, but as they have no bearing on the jurisdictional challenge at issue, they are not engaged with here.

**I. The Assignment of Branson Label was a pretext for manufacturing jurisdiction.**

Branson Label describes the transfer of Branson Label from Peter Rea to Marvin Elfant as "an arm's length, indeed contentious transaction" (Doc. 29 p.2) in an attempt to characterize Elfant and Rea as "adverse parties pursuing their own respective interests." (Doc. 29-1 p.3 ¶7). But both the *circumstances* of the assignment and the *terms* of the assignment show that it was an orchestrated maneuver to manufacture jurisdiction.

**A. The surrounding circumstances of the assignment show it was pretextual.**

Despite Branson Label's allegations that its claims are worth "well in excess of $75,000" (Doc. 29 p.9), the agreement for Nekome to acquire 100% of Branson Label's stock was a mere oral agreement — hardly indicative of an arm's-length transaction. Elfant protests in his declaration that neither he nor his business entities had any "prior business, personal, or other relationship with the Reas or any of their entities or affiliates." (Doc.29-1 p.3 ¶7.) This is directly contradicted by Elfant's own accountants, who relate how Elfant's business entities, Nekome and ME Holding, were organized precisely for the purpose of bankrolling the Coverdell litigation (Doc. 29-1 p. 12), a decade-long saga intimately connected to Peter Rea.[2] Whatever unholy alliance existed between Rea and Elfant before the assignment, Elfant's transition from behind-the-scenes financier to active participant hardly weakens it.

Cognizant of the oral agreement's collusive appearance, Branson Label tries to put distance between Rea and Elfant by saying that Elfant, acting through Nekome, had to "commence[] litigation against the Reas" to enforce the agreement. (Doc. 29 p.5.) It was supposedly only after "enter[ing] into a settlement agreement" that the Reas went through with the assignment. (Doc. 29 pp. 2, 5.) But the existence of this Nekome lawsuit only raises more concerns about the legitimacy of the transaction. The claims in the Nekome lawsuit are

---

[2] The history of Peter Rea and his involvement in the lawsuits financed through Elfant's shell companies provides even further evidence of the collusion behind Branson Label's assignment. In light of the other indicia of fraud apparent here, recounting those details is unnecessary for the Court to find that jurisdiction has been improperly manufactured, but hat history is ably described in the City of Branson's brief, Doc. 31.

21973292v4

questionable at best, and fraught with statute-of-frauds problems. *See Nekome, LLC v. Peter Rea and Darlene Rea*, 6:14-cv-03153-MDH, Doc. 1 (the "Nekome Complaint"). And calling this Nekome lawsuit "contentious" is a huge stretch. As evident from the Court's CM/ECF docket, the Reas were never served with process, never filed a responsive pleading, never entered an appearance, and the case was dismissed, with prejudice, without any settlement documented. *Id.*

The term *pretext* has, in other contexts, been described as an attempt to afford "papered-over plausibility." **N.L.R.B. v. Jack August Enterprises, Inc.**, 583 F.2d 575, 578 (1st Cir. 1978). But the collusive assignment here lacks even the pretense of paper. Branson Label's allegations regarding the assignment rest entirely on the declaration of Marvin Elfant,[3] with a conspicuous lack of any documents supporting it: no original agreement, no settlement agreement, no notes or correspondence regarding the alleged negotiations, and no documentation of the actual transfer of stock.[4] From start to finish, the undocumented assignment of Branson Label only furthers the presumption of pretext here.

### B. The terms of the agreement show that the assignment was pretextual.

In addition the circumstances of the deal, the content of the agreement is even more problematic for Branson Label. Its own description of the terms eliminates any doubt that the arrangement was pretextual. First, although Branson Label says the subject of the agreement was "100% of the stock in Missouri Branson Label," only the legal claims were of importance to the parties. Branson Label had no any actual business operations, employees, or stock; legal claims constituted its only assets. Indeed, in the Complaint that Nekome pleaded against the Reas, it acknowledges that the value of Branson Label shares consist entirely of "the relation they bear to

---

[3] This Court has observed the rule that, in the summary-judgment context, "a plaintiff may not rely on his own self-serving affidavits," at least where he "asserts facts that are wholly unsupported by documentary evidence in an effort to demonstrate a genuine issue of material fact for trial." **Van Deelen v. City of Kansas City**, 411 F. Supp. 2d 1105, 1120 (W.D. Mo. 2006) (citing **O'Bryan v. KTIV Television**, 64 F.3d 1188, 1191 (8th Cir.1995)). That rule should have all the more force where, as here, a plaintiff bears the burden of demonstrating jurisdiction, and offers no documentary evidence in support. *See, e.g.,* **Nike, Inc. v. Comercial Iberica de Exclusivas Deportivas, S.A.**, 20 F.3d 987, 992 (9th Cir. 1994) (rejecting affidavits purporting to show the "excellent business reasons" for a collusive assignment).

[4] And this despite Nekome's statements that, even before its suit against the Reas, it had already prepared the documents to assign the stock. (Nekome Complaint ¶18.)

the control of claims owned by Branson Label." Apart from those claims, the shares of Branson Label stock "have no market value." (Nekome Complaint ¶38.) Not only were those claims the *sine qua non* of the Branson Label stock assignment, the agreement provided that the assignor—Peter Rea—*continues to have a stake in those claims*, and retains the right to receive a portion of any proceeds. (Doc. 29 p.4; 29-1 p.3 ¶6.) He supposedly received an undisclosed sum of "cash consideration," but Rea will also receive an undisclosed percentage of "any resulting recovery" from the lawsuit. (*Id.*) Moreover, the entire assignment hinges on Elfant, through Nekome, agreeing to "fund and pursue" the claims alleged in this case. (Id.) These facts put federal jurisdiction squarely at odds with the Supreme Court's decision in ***Kramer v. Caribbean Mills, Inc.***, 394 U.S. 823 (1969).

In ***Kramer***, a cause of action was assigned for a single dollar, with a promise to pay to the assignor "95% of any net recovery on the assigned cause of action, 'solely as a Bonus.'" ***Id.*** at 824. The Court in ***Kramer*** concluded that such an assignment "falls not only within the scope of § 1359, but within its very core," and thus "it follows that the District Court lacked jurisdiction to hear the action." ***Id.*** at 830. For all that Branson Label has revealed about it the terms of its agreement, the arrangement here *could be identical* to the one in ***Kramer***. The crucial point here is that Branson Label has the burden of showing the legitimacy of the assignment. Branson Label could only have rebutted the presumption of invalidity here by showing what the terms of the assignment were, *and* that they were legitimate. It did neither. To the extent the arrangement is known, it has every indication of a collusive assignment. Moreover, even the collusive assignment in ***Kramer*** did not go so far as to expressly require that the assignee "fund and pursue" the assigned claims, which Branson Label admits to be an express condition here.

Given the nature of Branson Label's business activities—or lack thereof, as discussed more below in Part III—the reason for assigning the shares of Branson Label to a resident of a foreign state is obvious: for Branson Label to move its "nerve center" for purposes of its citizenship, the corporation needed to be managed outside of Missouri. There is no dispute that

before the assignment, "Branson Label . . . [was] a Missouri corporation with its principal place of business in Missouri," thus qualifying as a Missouri citizen under *both* prongs of 29 U.S.C. 1332(c)(1). (Nekome Complaint ¶7.) The pretextual assignment to Nekome sought to eliminate the first of these grounds. The next step was then to change Branson Label's state of incorporation, which Elfant attempted through merger into a new Florida corporation.

**II. The merger of Branson Label was a pretext for creating jurisdiction.**

The primary argument advanced by Branson Label for merging into a new Florida entity—just four days[5] before filing this diversity-of-citizenship action—is the supposed tax benefits it could thus enjoy. This fails as a legitimate business reason on several fronts, but primarily because it is simply incorrect. Branson Label's state of incorporation is irrelevant when it comes to determining Missouri tax liability for either business or nonbusiness income. Missouri has adopted the Multistate Tax Compact for purposes of allocating income between Missouri and non-Missouri sources. RSMo. § 32.200 ("MTC"). Under the MTC, *business income* is allocated according to location of sales, or alternatively using a three-factor formula based on sales, property, and payroll. MTC Art. IV § 9; RSMo. §§ 143.451 & 143.461. Under either business-income formula, the state of incorporation is irrelevant.

*Nonbusiness income* is allocated primarily based on the location of the property being sold or producing the income. *See* MTC Art. IV §§ 4–8. Even where income is allocated based on a corporation's commercial domicile, such as income generated from intangible property, the term "corporate domicile" is defined for MTC purposes without regard to the state of incorporation. *See* MTC Art. IV § 1(2). Additionally, capital gains from sales of real property located in Missouri are considered Missouri-sourced income, regardless of the state of

---

[5] Thanks in part to the indicia of fraud and collusion presented in Branson Label's response, it is certainly not true that Empire's motion is "based on nothing more than the . . . proximity in time between those events." (Doc. 29 p.1.) Still, the timing itself should not be overlooked. *See Nike, Inc. v. Comercial Iberica de Exclusivas Deportivas, S.A.*, 20 F.3d 987, 992 (9th Cir. 1994) ("If we had any remaining doubts whether NIL and Nike acted at least in part to obtain a federal forum, the timing of the assignment, only three days before Nike filed the complaint in this action, dispels them.").

incorporation. *See* MTC Art. IV. § 5(1). The only situation where a state of incorporation is a factor involves rents and royalties from tangible *personal* property — which is certainly not at issue here. *See* MTC Art. IV § 5(2)(b).

Thus, regardless of whether Branson Label's hoped-for income is considered business or nonbusiness in nature, claiming Florida as its state of incorporation confers no income-tax savings. Branson Label's overnight transformation from a Missouri corporation to an indentically named Florida corporation did not provide *any* real benefit it did not otherwise have — except the prospects of fabricating diversity of citizenship.

And even if the state of incorporation mattered for income-tax purposes, a difference in tax rate would still fail as a legitimate business reason because income-tax savings are illusory without any income. Branson Label has no business activities to generate income aside from its current batch of federal lawsuits (which, in turn, depend on the existence of diversity jurisdiction). At a minimum, the timing of the merger is suspect. With the prospects of income being months or years down the road, Branson Label certainly had no motive to change its state of incorporation *when* it did — except to manufacture diversity.

If further evidence of pretext were needed, the letter from Elfant's accountants provides other examples in addition to its mistaken—if not fraudulent—advice. The overall intent of the accountants' letter is obviously to provide cover to an already established plan. Although Elfant and Branson Label describe the letter objectively as a response to a neutral request for "an appropriate business and tax structure" (Doc. 29 p.5, Doc. 29-1 p. 4 ¶17), the letter itself indicates otherwise. The actual prompt it responds to is "whether it would be advisable to reorganize BL outside the State of Missouri." (Doc. 29-1 p.13.) And the conclusion was likewise predetermined: following an explanation of the proposed Florida merger, the letter notes that "[t]his is the position *we discussed taking*." (Doc. 29-1 p.14, emphasis added.)

Aside from the incorrect and illusory tax advice, the other pretextual business reasons given for the merger are the *de minimis* conveniences of being located in Florida, reasons akin to

those given in *Toste Farm Corp. v. Hadbury, Inc.*, 70 F.3d 640, 641 (1st Cir. 1995). In *Toste Farm*, the plaintiffs focused on such "business reasons" as the location of an existing bank account for possible future investments and convenience of an individual already conducting other business in the state. The court rightly saw through this patchwork of pretexts:

> [The plaintiffs] would scarcely be deeply concerned as to where the state of incorporation and principal office of this paper corporation were located, **given that there were no employees and no ongoing operations**. . . . The significant reason appears to be the improper one: "to invoke the jurisdiction" of the federal court, § 1359 . . . "a manufactured assignment concocted and designed by a single individual using the diversity statute as a ploy to create jurisdiction."

*Id.* (quoting *Toste Farm Corp. v. Hadbury, Inc.*, 882 F. Supp. 240, 247 (D.R.I. 1995)) (emphasis added).[6] The incidental pretextual reasons offered by Branson Label leave no doubt that the merger was a ploy to fabricate jurisdiction.

In still another attempt to defending the legitimacy of its merger, Branson Label points to the case of *Madsen v. Am. Home Products Corp.*, 477 F. Supp. 2d 1025, 1028 (E.D. Mo. 2007), describing it as "the leading precedent in this district." (Doc. 29 p.10.) *Madsen* is actually from our neighboring district, but it is indeed instructive—especially contrasted to the present facts.

In *Madsen*, a corporate merger took place in 2001, as part of a massive business-reorganization plan that began with an analysis of corporate structure in the late 1980s, and culminated in a reduction from 78 domestic subsidiaries in 1999 down to just 45 in 2005. *Id.* at 1031. This "streamlining process . . . eliminated the need to file approximately 586 state and local tax returns." *Id. Madsen* is distinguishable for at least three important reasons: First, the restructuring of a behemoth organization is a far cry from the merger of a recently defunct corporation with a newly formed entity in a foreign state, especially when neither actually do any

---

[6] Branson Label attempts to distinguish *Toste Farm* because the plaintiff in that case had previously filed an action and been dismissed for lack of diversity. Branson Label makes no effort to show how Elfant's coordination with and funding of other protracted litigation concerning the same property is somehow less suspicious. Elfant's own accountants note this involvement, and describes the acquisition of Branson Label in reference to it as one "important element in the legal strategy to realize a successful [sic] on your investment." (Doc.29-1 p.13.)

business. Second, the merging entities in *Madsen* were well-established corporations forced to *defend* an action brought some six months after the merger — not a *plaintiff* who signs merger documents and files suit while the ink is scarcely dry. Third, the court in *Madsen* expressly noted that other courts have found mergers to be a sham where the assets transferred *in* the merger were "related to the matter before the court." *Id.* at 1131 n.11. The *Madsen* court expressly distinguished such precedents, since the assets in the merger there were "unrelated to instant controversy." *Id.* Here, *all* of the assets involved in the merger—indeed, Branson Label's only assets—are the very claims at issue. This court should indeed follow the reasoning of *Madsen*, by dismissing this action because "the merger in question [is] a sham."[7] *Id.*

### III. The business activities of Branson Label are a pretext to fabricate jurisdiction.

Desperate to show that it is a citizen of Florida alone, Branson Label insists it has "carried out substantial business activities at its listed address in Florida." (Doc. 29 p.3). But aside from Elfant's communications with counsel, and his declaration signature, the "substantial" business activities of Branson Label apparently consist of Marvin Elfant thinking thoughts about this litigation — but thinking them in either Florida or New Jersey. (Doc. 29-1 p.7 ¶30–31.) Branson Label claims its "nerve center" is, in essence, Marvin Elfant's own central nervous system. But Elfant's neural activity does not end the nerve-center inquiry.[8]

As discussed in Empire's original brief, the Supreme Court adopted the "nerve-center" principal-place-of-business test in *Hertz Corp. v. Friend*, 559 U.S. 77 (2010). As recently noted by another District Court, "*Hertz* displayed a pragmatic focus on finding the actual center of corporate control," and "did not reject [the] guiding principle that a corporation's principal place of business can be the location where individuals, *even those affiliated with a different entity in*

---

[7] Of course, the validity of the merger itself as a matter of state law is irrelevant to whether it is a sham or pretext for purposes of federal diversity jurisdiction. *Kramer v. Caribbean Mills, Inc.*, 394 U.S. 823, 829 (1969).

[8] Additionally, the relevant question—unanswered by Elfant—is the corporate activity at the address as of the date of filing, since that is the date that actually matters. *Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 570-71 (2004). The assertion that currently "Branson Label **is** actively engaged in business" is irrelevant. (Doc. 29 p. 15, emphasis added.)

*the corporate family*, carry out the party's jurisdictionally relevant activities." ***Moore v. Johnson & Johnson***, 2013 WL 5298573 at *5 (E.D. Pa. 2013) (emphasis added).

Regardless of Peter Rea's precise position in the "corporate family," there's no doubt that he has been *the* controlling force for the corporation since its inception. (*See, e.g.*, Doc. 1-5, 1-6, 1-7; Doc. 29-1 pp. 16–17.) In a very real sense, Rea is still controlling the activities of the corporation today — through the conditions imposed on the assignment to Nekome, even if not in a more direct day-to-day manner (which still appears quite likely). To suddenly ignore Rea's involvement because of a contrived eleventh-hour change in ownership would be to ignore the Supreme Court's clear instructions in ***Hertz***:

> Indeed, if the record reveals attempts at manipulation—for example, that the alleged "nerve center" is nothing more than a mail drop box, a bare office with a computer, or the location of an annual executive retreat—the courts should instead take as the "nerve center" the place of actual direction, control, and coordination, in the absence of such manipulation.

559 U.S. at 97. In the absence of the manipulation at work in *this* case, the place of "actual direction, control, and coordination" would unquestionably be Missouri.

The inability of Branson Label to legally transact business in its designated "principal place of business" is also relevant to this same inquiry. There is no doubt that any business operations at its Florida address on the date of filing would be in violation of restrictive covenants, zoning laws, and county ordinances. The applicable restrictive covenants plainly provide that lots including the Senterra Drive property may not be used "except for residential purposes" (Ex. H, Doc. 37-3 p.23,) and Elfant took title subject to those restrictions. (Ex. G, Doc. 37-2). The zoning restrictions in Article 4.B.1.A.70, a copy of which was helpfully filed as an exhibit by Branson Label, includes a requirement that any businesses conducted in homes must be "operated pursuant to a valid business tax receipt for the use conducted by the resident of the dwelling." (Doc.29-1 p. 19, ¶e.) And in addition, a signed "Certificate of Compliance" is also required — and the one filed by Branson Label is conspicuously not signed. (Doc. 29-1 p.20.)

Finally, a request to Palm Beach County confirmed that "even a one-person business or home-based business[] must have a Local Business Tax Receipt." (Ex. F., Doc. 37-1.) Palm Beach has no record of any such tax receipt being granted (or even requested) by Branson Label or any other entity at the 16620 Senterra Drive address. (*Id.*)

Assuming Branson Label's intent was not to violate the law or to fabricate jurisdiction, the most charitable interpretation would be that Branson Label has not yet completed its transition to its chosen headquarters. While still "in the process of relocating its 'nerve center'" between two states, a transitioning corporation should be "held to be a citizen of both." ***Branch Banking & Trust Co. v. R&T Rentals, LLC***, 2011 WL 1539939 at *4 (S.D. Ala. 2011) (citing ***Engels v. Exel Global Logistics, Inc.***, 2005 WL 850879 at *5–6 (N.D. Cal. 2005)).By claiming, as its principal place of business, a place where business cannot yet be lawfully operated, Branson Label should either be deemed a citizen of its previous place of business—Missouri—or at best a citizen of both. Either way, complete diversity is lacking. The alternative—Branson Label's factitious theory that it may instantaneously claim a for-sale Florida residence as a business headquarters irrespective of whether it can legally do business there—flouts the Supreme Court's holding in ***Hertz***, and eliminates any doubt as to the level of gamesmanship employed here. There is no actual diversity of citizenship, and the appearance of it "has been improperly or collusively made to invoke the jurisdiction of [this] court." 28 U.S.C. § 1359.

**IV. Conclusion**

Dismissal of this case is appropriate for many reasons, but chiefly because the Court lacks jurisdiction to even consider the other issues in this case. Because Branson Label cannot meet its burden of showing that subject-matter jurisdiction is proper, further proceedings beyond a dismissal would be "a nullity." ***Madsen***, 477 F. Supp. at 1029 (citing ***Am. Fire & Cas. Co. v. Finn***, 341 U.S. 6, 17–18, (1951)). This Court should therefore grant Empire's motion to dismiss under Rule 12(B)(1) and 28 U.S.C. § 1359.

Respectfully Submitted,

LATHROP & GAGE LLP

By: /s/ *Joshua Christensen*
Dan Nelson #31486
Joshua B. Christensen #63759
910 E. St. Louis, Suite 100
Springfield, MO 65806
(417) 886-2000 FAX: 886-9126
dnelson@lathropgage.com
jchristensen@lathropgage.com
***Attorneys for Defendant***
***Empire District Electric Company***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a complete copy of the foregoing was electronically filed this 17th day of July, 2014, using the Court's CM/ECF system, providing notification to:

| | |
|---|---|
| Brett M. Doran<br>Gregory E. Ostfeld<br>Paul Del Aguila<br>Paul T. Fox<br>Greenberg Traurig, LLP<br>77 West Wacker Drive, Suite 3100<br>Chicago, IL 60601<br>doranb@gtlaw.com<br>ostfeldg@gtlaw.com<br>delaguilap@gtlaw.com<br>foxp@gtlaw.com<br>*Attorneys for Plaintiff Branson Label* | John Hein<br>William L. Sauerwein<br>Sauerwein, Simon, & Blanchard PC<br>147 N. Meramec<br>St. Louis, MO 63105<br>jjh@sauerwein.com<br>wls@sauerwein.com<br>*Attorneys for Defendant*<br>*City of Branson, MO* |
| S. Jacob Sappington<br>Randy P. Scheer<br>Sanders, Warren & Russell LLP<br>1949 E Sunshine Street, Suite 2-102<br>Springfield, MO 65804<br>j.sappington@swrllp.com<br>r.scheer@swrllp.com<br>*Attorneys for Plaintiff Branson Label* | Daniel J Welsh<br>Summers Compton Wells, LLC<br>8909 Ladue Road<br>St. Louis, MO 63124<br>Email: dwelsh@summerscomptonwells.com<br>*Attorneys for Defendant*<br>*HCW Development Company, LLC,*<br>*HCW Private Development, LLC, and*<br>*HCW North, LLC* |

/s/ *Joshua Christensen*
Attorney of Record